UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TIMOTHY HALL,

　　　　Plaintiff,

v.

BLAKE NAVARRE,
CO'VOSIEE COWAN,
TIMOTHY BARR, and
CITY OF DETROIT,

　　　　Defendants.

Case No. 21-12970
(*consolidated with* 22-11797)

Honorable Laurie J. Michelson

---

**OPINION AND ORDER**
**DENYING HALL'S MOTION FOR RECONSIDERATION [58] AND**
**GRANTING IN PART COWAN, BARR, AND THE CITY OF DETROIT'S**
**MOTION FOR SUMMARY JUDGMENT [51]**

---

In August 2020, Timothy Hall was protesting in downtown Detroit when Detroit police officers ordered the protestors to disperse because they were blocking Woodward Avenue, a major city street. The protest was one of many that occurred that summer in response to the murder of George Floyd.

After repeating orders to disperse over the loudspeakers, police officers formed a line, moved toward protestors on Woodward, and detained them. The officers also used tear gas.

At this time, Hall was standing on the sidewalk when Officer Blake Navarre ran toward him and tackled him to the ground. Hall was zip-tied and dragged to the curb. According to Hall, Officer Co'Vosiee Cowan eventually took him to the hospital to treat his injuries and then transported him to the Detroit Detention Center. There,

Officer Timothy Barr issued Hall a citation for disorderly conduct, disobeying a lawful order from a police officer, and obstructing a moving lane of traffic. These charges were ultimately dismissed.

Believing the officers' behavior to be unconstitutional, Hall sued Navarre, Cowan, Barr, and eventually the City of Detroit for violations of his First and Fourth Amendment rights and of state law. Cowan, Barr, and the City of Detroit now move for summary judgment on all claims against them.

Apparently dissatisfied with discovery, Hall also moved this Court to reopen discovery and allow him more time to investigate his *Monell* claims. The Court denied this motion, and Hall now moves for reconsideration.

For the reasons that follow, Cowan, Barr, and the City of Detroit's motion for summary judgment will be granted in part, with only Hall's First Amendment retaliation claim surviving as to Barr. Hall's motion for reconsideration utterly fails to meet the demanding standard for such relief and will be denied.

## I. Background

## A. Facts

On the evening of August 22, 2020, Timothy Hall went to downtown Detroit to participate in a protest against police brutality. Hall had been participating in similar protests throughout the summer of 2020, which were initially provoked by the murder of George Floyd. (*See* ECF No. 61, PageID.1631.)

Hall arrived at the protest in a gas mask, a flak jacket (i.e., a military-style vest that typically has body-armor plates in it, but Hall wore his without any plates),

elbow pads, knee pads, gloves, and jackboots.  (ECF No. 61, PageID.1627–1629, 1654.) Hall testified that he wore protective gear to the protest because he suffers from a heart condition and wanted to protect "the zipper from [his] heart operation." (*Id.* at PageID.1627–1628.) He was also aware of the potential for police intervention and the use of tear gas due to his experiences at past protests. (*Id.*) Specifically, in July of that year, Hall attended a protest after Detroit police officers shot Hakim Littleton. (*Id.* at PageID.1632.) Hall said that police intervened in the Littleton protest by pushing forward against the protestors, which resulted in him being "knocked down . . . with a shield[.]" (*Id.* at PageID.1640.) After the Littleton protest, a friend advised Hall to "have something on" when he attended protests. (*Id.* at PageID.1632.)

Officer Blake Navarre was a member of the arrest team of the Mobile Field Force, which was deployed to the August 22 protest. (ECF No. 51-10, PageID.934.) As the name suggests, the arrest team was charged with arresting certain protestors after a protest was dispersed. (*Id.*) As part of the arrest team, Navarre was also "tasked with doing social media surveillance, looking up videos, as well as looking up previous people that we've had contact with at previous protests to keep an eye on what they were saying." (*Id.* at PageID.935.) Navarre testified that Hall was one of these "targeted" individuals because he had assaulted Navarre at the Littleton protest. (*Id.* at PageID.935–936.) But officers were unable to identify Hall by name at that time, so according to Navarre, "based on my own previous experiences as well as talking to the Mobile Field Force command, their sergeants and lieutenants, we

3

needed to get him detained, arrested, and identified in order to actually properly label him, or get a name to him anyway." (*Id.* at PageID.935.)

Turning back to August 22, Navarre was called in before his usual 6 p.m. shift because "there was a large crowd growing, as well as intel that the protestors planned on taking control over public streets," including Woodward. (ECF No. 51-10, PageID.941.) After getting equipment from the precinct, Navarre's team was instructed to stay "stationed out of sight" near the protest until receiving further orders. (*Id.* at PageID.941–942.) While waiting, Navarre did his "own workups on [protestors'] live feeds on the group's Facebooks" and learned "who was there, what they were talking about, if I heard anything like antagonizing in nature or anything premeditated that they wanted to do that night, I would relay that information to supervision[.]" (*Id.* at PageID.943.) Navarre testified that the team was also given "orders from violent crime task force to effect an arrest on Ethan Ketner," a member of Detroit Will Breathe, "regarding the criminal activity that he had been taking a part of previously." (*Id.*) At that time, Navarre "noticed Timothy Hall wearing his body armor as well as his gloves with the hard knuckles, boots, tactical pants, as well as a gas mask" while walking with Ketner. (*Id.*) He identified Hall as the same individual from the Littleton protest by his "tattoo of the three arrows" and his face. (*Id.*)

According to Navarre, there were "many attempts to [disperse] the crowd verbally with orders that they would be placed under arrest for an unlawful assembly[.]" (ECF No. 51-10, PageID.944; ECF No. 51-15, PageID.1018 ("[S]everal

4

orders were given out over the loudspeakers for everyone to disseminate and leave the area. They were advised that it was an unlawful assembly, okay, and that if they did not leave, they would be placed under arrest.").) Hall recalls officers giving orders, but stated that they said, "This is an unlawful assembly and you are ordered to leave the roadways and enter the sidewalks." (ECF No. 61, PageID.1659.)

Though the timeline is not clear, at some point after officers ordered the crowd to disperse, Navarre's team was ordered to "slowly approach" the protestors on foot. (ECF No. 51-10, PageID.944.) The team then broke down the barriers that had been put up on Woodward in preparation for engaging with protestors and regrouped to discuss the individuals that were to be "detain[ed] on sight[.]" (*Id.*) Navarre said he received a verbal order to detain Hall on sight for "[a]ssaulting police at a previous incident as well as the current circumstances [of] . . . [u]nlawful assembly and disorderly conduct, as well as disobeying a lawful order." (*Id.* at PageID.944–945.) According to Navarre, the protest was unlawful because it "was taking over the street" and Hall "was part of the group that was disobeying a lawful order to [disperse]; a crowd that had taken over Woodward Avenue." (*Id.* at PageID.945.)

Once ordered to begin arrests, Navarre stated he "expeditiously made it to Mr. Hall as he was then starting to approach the group that was engaging with officers at that time, and then tackled him." (ECF No. 51-10, PageID.949.) Video taken from overhead from a nearby building shows Hall standing on the sidewalk near Woodward, where protestors were met by police. (Video Ex. 2, :01–:05.) Still on the sidewalk, Hall takes two steps backward and goes to turn around as police and

protestors clash on the streets. (*Id.* at :08–:10.) Someone—presumably Navarre—runs toward Hall and tackles him to the ground. (*Id.* at :11–:12.)

Hall says that he lost consciousness after Navarre tackled him. (ECF No. 61, PageID.1682.) "I wake up and . . . I felt my gloves being taken off. I felt the rest of my mask being peeled off my head, and then . . . there's like tear gas in my face and then I'm being dragged across the street." (ECF No. 61, PageID.1682.) Hall was zip-tied and taken to the curb, where he said an officer noticed he was bleeding. (*Id.* at PageID.1683.) He was then taken to Detroit Receiving Hospital in an ambulance. (*Id.* at PageID.1684.)

It was at this point that Officer Co'vosiee Cowan entered the picture, though the parties dispute exactly when. Hall says Cowan rode in the ambulance with him to the hospital (ECF No. 61, PageID.1695), while Cowan says he was dispatched to Detroit Receiving and met Hall there (ECF No. 51-13, PageID.985). Cowan did not see Hall at the protest nor did he have any information about Hall's activities during the protest. (*Id.* at PageID.986.) After Hall was treated at the hospital, Cowan and his partner transported Hall to the Detroit Detention Center. (*Id.*) Cowan was also ordered to fill out Hall's "Detainee Input Sheet" and to list disorderly conduct and obstructing justice as the charges. (ECF No. 51-13, PageID.988; ECF No. 51-11.) Hall was booked at the detention center, but the record does not reveal when he was released. (ECF No. 51-13, PageID.989.)

Likewise, Sergeant Timothy Barr had minimal interaction with Hall. The evening of August 22, Barr was sent to block traffic near the Shinola Hotel so vehicles

would not run into the protest. (ECF No. 51-15, PageID.1013.) After officers shut the protest down, Barr was "walking around trying to assist in any way" that he could when he was informed that there were some "injured prisoners[.]" (ECF No. 51-15, PageID.1014.) Barr went to that area and saw Hall sitting on the curb with this group. (*Id.*) However, he did not speak to Hall. (*Id.* at PageID.1016.)

At some point, Barr was ordered to assist with issuing tickets to arrested protestors. (ECF No. 51-15, PageID.1016.) So he went to the Detroit Detention Center, issued a ticket to each protestor who was on the police bus, and then "walk[ed] them up to the gate at the Detroit Detention Center, and hand[ed] them off to someone from the processing unit." (ECF No. 51-15, PageID.1016–1017.) Barr agreed he issued a ticket to Hall, though he "cannot recall how [he] got his information" as Hall was at the hospital during this time. (*Id.* at PageID.1017.) Though Barr did not see Hall during the protest, he determined that Hall "was in a group" that committed the cited infractions because "he was taken into custody by a member of the Detroit Police Department. He had zip ties on, which would lead me to believe he was at the scene." (ECF No. 51-15, PageID.1018.) Barr ticketed Hall for disorderly conduct, disobeying a lawful order of a police officer, and blockading a moving lane of traffic. (ECF No. 51-14.) The charges were later dismissed on March 1, 2021. (ECF No. 57-10, PageID.1524.)

## B. Procedural History

Some months later, Hall filed a complaint against Navarre, Cowan, and Barr. (ECF No. 1.) After some preliminary discovery and settlement discussions, Hall

moved to add the City of Detroit as a defendant and to add a First Amendment claim, which the Court denied in part. (ECF No. 25.) Hall then separately sued the City of Detroit in state court, the City removed the lawsuit to this Court, and the parties stipulated to consolidate the cases. (ECF No. 35.)

In time, the City of Detroit, Cowan, and Barr[1] moved for summary judgment on Hall's unlawful seizure, state and federal malicious prosecution, First Amendment retaliation, and *Monell* claims[2]. (ECF No. 51.)

That same day, Hall moved to reopen discovery. (ECF No. 52.) The Court denied this motion (ECF No. 54), and Hall moved for reconsideration (ECF No. 58).

Both the motion for summary judgment and the motion for reconsideration are before the Court. Given the adequate briefing and record, the Court considers both motions without further argument. *See* E.D. Mich. LR 7.1(f).

## II. Motion for Reconsideration

As Hall's motion for reconsideration pertains to a discovery issue, the Court addresses it first.

On February 3, 2023—three hours after the City, Barr, and Cowan timely filed a motion for summary judgment—Hall filed a motion to compel. (ECF No. 52.) He argued that the Court should amend the scheduling order under Federal Rule of Civil Procedure 16(b)(4) and compel the City to correct the deficient responses it provided

---

[1] Navarre did not move for summary judgment so the claims against him are not at issue in this opinion.

[2] Hall also brought a Due Process claim in his amended complaint, but the parties stipulated to dismiss it. (ECF No. 27, PageID.277.)

to Hall on December 12, 2022. (ECF No. 52, PageID.1084, 1089.) In his motion, Hall acknowledged that "discovery technically closed on November 4, 2022." (*Id.* at PageID.1085.)

The Court denied this motion as untimely. (ECF No. 54.) The Court explained that it was "well established in this Circuit that 'a district court may properly deny a motion to compel discovery where the motion to compel was filed after the close of discovery.'" (*Id.* at PageID.1260 (quoting *Pitman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 642 (6th Cir. 2018)).) The Court explained that Hall provided no reason for waiting until the day dispositive motions were due to move to compel responses and no explanation for why he did not ask to extend the schedule at any point from October 6, 2022—when the claim against the City was consolidated with this case— to February 3, 2023. (*Id.* at PageID.1260 ("Yet, inexplicably, Hall did not ask for an extension of the schedule at that time. Instead, he waited four months after the *Monell* claim was added, three months after fact discovery closed, and hours after Defendants moved for summary judgment to ask this Court to adjourn the schedule.").)

In seeking reconsideration, Hall backpedals. He now argues that "despite the Order for consolidation, Plaintiff's *Monell* complaint (which has a distinct case number) and asserted a new party (the City of Detroit) was not procedurally merged into the current case's scheduling order." (ECF No. 58, PageID.1541.) Thus, argues Hall, the Court was required to issue a new scheduling order for the consolidated case and it acted in violation of Federal Rule of Civil Procedure 16 by not doing so. Boldly,

9

Hall claims, "Plaintiff has been inadvertently punished and prejudiced as a result of the Court's failure to comply with Rule 16(b). Had the Court undertook a scheduling conference pursuant to Rule 16(b)(1)(B), Plaintiff's counsel certainly would have raised these timing issues. Whether or not Plaintiff had a duty to raise the issue sooner . . . only the Court 'must' issue a scheduling order." (ECF No. 58, PageID.1544.)

Nothing in Hall's argument warrants reconsideration of the Court's order. For starters, the local rules do not provide for reconsideration based on a party's change in position after its motion has been denied. *See* E.D. Mich. LR 7.1(h)(2)(A) ("The court made a mistake, correcting the mistake changes the outcome of the prior decision, and the mistake was based on the record and law *before the court* at the time of its prior decision[.]" (emphasis added)). Tellingly, Hall made no mention of this Court's supposed violation of Rule 16 in his initial motion. (*See* ECF No. 52.) Instead, he argued the opposite—that the scheduling order the Court issued pre-consolidation should be amended for good cause under Rule 16(b)(4). That cannot be reconciled with the position that no scheduling order was ever issued. The Court will not entertain motions for reconsideration based on a moving target.

Second, after the Court entered the parties' stipulated order to consolidate the cases, it docketed a notice to the parties. This notice stated, "[a]ll original deadlines and hearings remain in effect, unless otherwise notified by judge's chambers." (ECF No. 36, PageID.449.) This notice was docketed on August 15, 2022 and would have made Hall aware that the Court would not automatically amend the scheduling order

based on consolidation of the new case nor issue a new order. Yet Hall did not object to this notice. And to the extent Hall objects now (*see* ECF No. 58, PageID.1542), his motion is untimely. E.D. Mich. LR 7.1(h)(2) ("Motions for reconsideration of non-final orders . . . must be filed within 14 days after entry of the order[.]").)

More fundamentally, it is clear that Hall has concocted a post-hoc rationalization to reach a result the Court already foreclosed. That is evidenced not only by him taking contradictory positions between his original motion and the motion for reconsideration, but by the logic he employs in the latter. For example, Hall argues that the scheduling order could not apply to the consolidated case because "it did not occur after either a 26(f) report or after consulting with the parties' attorneys." (ECF No. 58, PageID.1542.) But Rule 26(f) puts the onus on the parties—not the Court—to confer with each other in a timely manner and submit a report. It states, "The attorneys of record . . . are jointly responsible for arranging the conference, for attempting in good faith to agree on the proposed discovery plan, and for submitting to the court within 14 days after the conference a written report outlining the plan." Fed. R. Civ. P. 26(f)(2). Presumably, if Hall believed the rules required the Court to issue a new schedule, he would have attempted to arrange such a conference and submit a new plan to the Court. As far as the Court is aware, he did not.

Further, Rule 26(f)(1) states that "the parties must confer as soon as practicable—and in any event at least 21 days before a scheduling conference is to be held or scheduling order is due under Rule 16(b)." In turn, Rule 16(b) says the "judge

must issue the scheduling order . . . within the earlier of 90 days after any defendant has been served with the complaint or 60 days after any defendant has appeared." Again, it does not appear that Hall complied with this step. But his own logic dictates that he would have done so had he understood the rules to require a new schedule.

And finally, Rule 26(d)(1) prescribes that a "party may not seek discovery from any source before the parties have conferred as required by Rule 26(f)[.]" So if the Court were to accept Hall's current argument that no applicable Rule 26(f) conference took place, Hall's requests to the City for discovery on the *Monell* claim would be improper.

Simply put, Hall's argument for reconsideration fails. On August 15, 2022, the parties stipulated to consolidate the two cases. The same day, the Court advised that the schedule would remain unchanged. Only after discovery closed and after a motion for summary judgment was filed did Hall ask to extend the close of discovery. The Court declined to extend the schedule. Now, Hall turns heel and says the Court is to blame for his failure to timely seek an extension of discovery. And he does so by employing an interpretation of the rules and scheduling order that he clearly did not hold until all other avenues to extend the schedule were foreclosed. The Court is unconvinced, to say the least. And it will not now entertain Hall's weak bid to correct his own mistakes.

Accordingly, the motion for reconsideration is denied (ECF No. 58), and the Court will consider the motion for summary judgment in its entirety.

### III. Motion for Summary Judgment

### A. Unreasonable Seizure[3]

As Hall has agreed to dismiss the unreasonable-seizure claim against Barr, the Court will only consider whether a reasonable jury could find that Cowan unlawfully seized Hall. As a reminder, according to Hall, Cowan rode with him in the ambulance to the hospital and then transported him to the detention center.

To determine whether a seizure occurred within the meaning of the Fourth Amendment, the Court must determine "if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *California v. Hodari D.*, 499 U.S. 621, 627–28 (1991); *see also Florida v. Bostick*, 501 U.S. 429, 434 (1991); *Brendlin v. California*, 551 U.S. 249, 254–55 (2007). "A determination of whether a person is under arrest weighs such factors as 'significant restraints on the detainee's freedom of movement,' 'the transportation of the detainee to another location,' and 'use of . . . bodily force.'" *Alexander v. Carter for Byrd*, 733 F. App'x 256, 267 (6th Cir. 2018) (quoting *United States v. Lindsey*, 114 F. App'x 718, 722 (6th Cir. 2004)).

Hall was undeniably seized when he was tackled by Navarre and zip-tied. *See, e.g.*, *Torres v. Madrid*, 141 S. Ct. 989, 999 (2021) ("[T]he officers' shooting applied

---

[3] Defendants spend a portion of their motion arguing that there is no evidence of Hall being searched. (ECF No. 51-1, PageID.667–669.) It appears that Hall agrees, as his response brief notes that "when reading the complaint, it is clear there is not an allegation that Defendants Cowan or Barr ever unlawfully searched Plaintiff." (ECF No. 57, PageID.1344.) Thus, the Court will analyze this claim as one only for unlawful seizure.

physical force to her body and objectively manifested an intent to restrain her from driving away. We therefore conclude that the officers seized Torres for the instant that the bullets struck her.").

The issue thus becomes whether Cowan was "individually involved in the arrest." *See Harris v. City of Saginaw, Michigan*, 62 F.4th 1028, 1035 (6th Cir. 2023). The Court finds that he was not. Though the parties dispute Cowan's exact role, Hall does not say that Cowan was present or aided Navarre when he initially seized Hall. (ECF No. 61, PageID.1695 (testifying that Cowan "rode with me in the ambulance" but that he was not aware of any other interactions with Cowan).) Thus, no matter who a jury credits—Hall, who says Cowan rode with him in the ambulance, or Cowan, who said he met Hall at the hospital—it could not find that Cowan participated in Hall's seizure.

Hall resists this conclusion in a few ways. For one, he points to Cowan's testimony agreeing that he placed Hall under arrest. (ECF No. 51-13, PageID.990.) But an officer's subjective view of whether he seized an individual does not determine the ultimate issue. *See Torres*, 141 S. Ct. at 998 ("Moreover, the appropriate inquiry is whether the challenged conduct *objectively* manifests an intent to restrain, for we rarely probe the subjective motivations of police officers in the Fourth Amendment context."). Further, the facts to which Cowan testified make clear that he only interacted with Hall after Hall had been arrested. (ECF No. 51-13, PageID.985 ("We were strike force unit at that time, so they called more units to come down [to the protest]. When we got there, the protest was over, and we were told to go to Detroit

14

Receiving."); *id.* ("We . . . met [Hall] at [Detroit Receiving Hospital.]"); *id.* at PageID.986 (agreeing that he did not see Hall at the protest).) And later on in his deposition, Cowan agreed that he met Hall at the hospital after Hall had been arrested. (ECF No. 51-13, PageID.996.) So Cowan's own conclusions about whether he arrested Hall are inconsistent and irrelevant to the objective inquiry of whether he seized Hall.

Hall further argues that Cowan "played a critical role in arresting" him because "if he had done nothing . . . Plaintiff would have been free to go from the ER." (ECF No. 57, PageID.1346.) This argument fundamentally misunderstands the law on unlawful seizure. As the Supreme Court has recognized, "a seizure is a single act, and not a continuous act." *Torres*, 141 S. Ct. at 1002 (quoting *Hodari D.*, 499 U.S. at 625). "For centuries," the Court explained, "the common law rule has avoided such line-drawing problems by clearly fixing the moment of the seizure." *Id.* So too here. Hall's seizure plainly occurred when Navarre tackled him—that is the fixed moment of seizure. Without evidence that Cowan participated in that seizure, the claim against him must fail.

Hall makes one final attempt to save this claim. He argues that Cowan filled out the "Detainee Input Sheet" when he arrived at the Detroit Detention Center with Hall, which listed Hall's charges as disorderly conduct and obstructing justice. (ECF No. 57, PageID.1346.) But this argument fails to show that Cowan seized Hall for a similar reason. Because Hall was already seized by Navarre, Cowan's subsequent conduct cannot be considered participation in the arrest. *See Alexander*, 733 F. App'x

15

at 267–68 (concluding that defendant did not participate in the arrest because mere presence at the scene of arrest does not establish liability, and defendant's other alleged involvement occurred "after Alexander's arrest and fail to show involvement in the arrest").

Accordingly, the Court finds that there is no evidence that Cowan arrested or participated in the arrest of Hall. Thus, he cannot be liable for unlawful seizure, and that claim against him is dismissed.

## B. Federal Malicious Prosecution

Next, the Court considers Hall's federal malicious-prosecution claim against Cowan and Barr.

"To succeed on this claim, [Hall] must prove four things: (1) that a criminal prosecution was initiated against him and that the defendant made, influenced, or participated in the decision to prosecute; (2) that there was a lack of probable cause for the criminal prosecution; (3) that, as a consequence of a legal proceeding, he suffered a deprivation of liberty apart from the initial seizure; and (4) that the criminal proceeding was resolved in his favor,[.]" *Wright v. City of Euclid, Ohio*, 962 F.3d 852, 875–76 (6th Cir. 2020) (internal citations omitted).

### 1. Cowan

The claim against Cowan fails at step one, as Hall cannot show that Cowan "made, influenced or participated in the decision to prosecute[.]" *See id.* To make this showing, "there must be some element of blameworthiness or culpability in the participation[.]" *Id.* at 876. "At minimum, whether an officer influenced or

16

participated in the decision to prosecute hinges on the degree of the officer's involvement and the nature of the officer's actions." *Id.*

Neither of the two main actions Cowan took with respect to Hall—transporting him and filling out his detainee input sheet—constitute influence or participation in the decision to prosecute.

Hall argues that Cowan "played a role in the cog of prosecution by bringing Plaintiff to the DDC where he would be charged." (ECF No. 57, PageID.1348.) This broad understanding of malicious prosecution is contrary to law. Indeed, it would bring any officer's conduct that facilitated a prosecution into the folds of a malicious prosecution claim, which stretches the claim beyond its recognized application. *See Sykes v. Anderson*, 625 F.3d 294, 308 (6th Cir. 2010) ("The tort of malicious prosecution is entirely distinct from that of false arrest, as the malicious prosecution tort remedies detention accompanied not by absence of legal process, but by the *wrongful institution* of legal process." (citations omitted)). Cowan's transportation took place before—or perhaps concurrently with—the issuance of Hall's ticket, which instituted legal process in this case. And on a more basic level, the Court is hard pressed to see how transporting someone to a detention center has any effect on the "*decision* to prosecute." *See Meeks v. City of Detroit, Michigan*, 727 F. App'x 171, 178 (6th Cir. 2018) ("The term 'participated' is construed 'within the context of tort causation principles.'" (quoting in part *Webb v. United States*, 789 F.3d 647, 660 (6th Cir. 2015))). The two events are entirely distinct. Cowan may have transported Hall to the detention center as instructed, and Hall could have been released without

citation. Alternatively, Cowan could have let Hall go home from the hospital, and Hall may still have received a citation in the mail. Thus, Cowan's role in transporting Hall did not influence the decision to prosecute Hall.

As for filling out the input sheet at the detention center, Cowan testified that he "was advised to put on the intake sheet the disorderly conduct and obstructing justice. . . . why he got charged in the two situations, I don't know. But I was ordered to put disorderly conduct and obstructing." (ECF No. 51-13, PageID.988.) Hall has not shown how this behavior—filling out an input sheet as instructed—constitutes "blameworthy," as opposed to "neutral" or "passive," behavior. *See Gardner v. Evans*, 920 F.3d 1038, 1065 (6th Cir. 2019) ("To be liable for 'participating' in the decision to prosecute the officer must participate in a way that aids in the decision, as opposed to passively or neutrally participating."); *Johnson v. Moseley*, 790 F.3d 649, 656 (6th Cir. 2015) ("Similarly insufficient is plaintiff's allegation that defendants 'instigated or participated in' or 'pressed' the prosecution. Again, absent allegation of blameworthy conduct, such 'neutral' participation is insufficient to sustain a facially valid malicious prosecution claim."). Even if this conduct was blameworthy, Hall does not connect filling out the form to the decision to press charges against him. Hall attempts to shift the burden to Defendants by arguing that Defendants provide no evidence that the detainee input sheet "is not a charging document." (ECF No. 57, PageID.1348.) But it is Hall's burden to show that Cowan's conduct "influenced . . . the decision to prosecute," *see Wright*, 962 F.3d at 875, not Defendants' burden to show that it did not. And without evidence to the contrary, the

18

Court is skeptical that an input sheet for a detention center is related to a decision to press charges or continue with an individual's prosecution.

So the malicious-prosecution claim is dismissed as to Cowan.

### 2. Barr

Barr, who ticketed Hall, argues that he is entitled to summary judgment on the malicious-prosecution claim because of the collective-knowledge rule (also known as the "fellow officer" rule). Though Barr argues that this rule applies to both the participation and probable cause elements of a malicious prosecution claim (ECF No. 51-1, PageID.675), the Court believes it more squarely applies to probable cause. *See United States v. Duval*, 742 F.3d 246, 253 (6th Cir. 2014) ("[T]he collective knowledge of agents working as a team is to be considered together in determining probable cause."). Thus, the Court will focus its analysis on whether Barr had probable cause to issue a citation to Hall based on the collective-knowledge rule.

Hall must show that Barr did not have probable cause to initiate a criminal proceeding against him. *Sykes*, 625 F.3d at 311. Probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity." *Lester v. Roberts*, 986 F.3d 599, 608 (6th Cir. 2021) (citing *District of Columbia v. Wesby*, 138 S. Ct. 577, 586 (2018)).

The collective-knowledge rule provides that, in making this probable-cause inquiry, the facts known to each officer working as a team can be considered together. *Duval*, 742 F.3d at 253. The rule "recognizes the practical reality that effective law enforcement cannot be conducted unless police officers can act on directions and

information transmitted by one officer to another." *United States v. Lyons*, 687 F.3d 754, 766 (6th Cir. 2012). So in conducting this analysis, the Court must "impute collective knowledge among multiple law enforcement agencies, even when the evidence demonstrates that the responding officer was wholly unaware of the specific facts that established" probable cause. *Id.* (citing *United States v. Hensley*, 469 U.S. 221, 229 (1985) and *Whiteley v. Warden*, 401 U.S. 560, 568 (1971)).

But the collective-knowledge rule does not apply as straightforwardly as Defendants argue. As a basic premise, the collective-knowledge rule presupposes communication among officers. But the record is not clear that Barr and other officers "communicated the relevant information among themselves." *Bauman v. Millisor*, No. 21-1527, 2022 WL 35470, at *3 (6th Cir. Jan. 4, 2022) ("Because the officers communicated this information among themselves before placing Bauman under arrest, we are able to look at the entire situation."). Barr did not testify that he spoke to Navarre about Hall nor did he say that Navarre's observations informed his reasoning in issuing the citation. And Navarre said he did not speak to Barr at any time that evening. (ECF No. 51-10, PageID.956.) Barr says that he determined to issue tickets after speaking with Lieutenant Cole, who "advised [him] that he could use our help in issuing tickets." (ECF No. 51-15, PageID.1016.) So it is not clear that other officers' knowledge should be imputed to Barr. *Cf. Bey v. Falk*, 946 F.3d 304, 317 (6th Cir. 2019) (finding that collective knowledge "applies when the information the officer receives is quite skimpy").

20

But even if it is, the officers' collective knowledge of Hall's behavior during the protest presents a fact issue as to probable cause. As a reminder, Barr issued Hall a citation for disorderly conduct, disobeying a lawful order of the police, and blockading a moving lane of traffic. (ECF No. 51-14, PageID.1009.) As those are the infractions Defendants raise in their briefing, the Court focuses on those in its probable cause analysis. *See District of Columbia v. Wesby*, 138 S. Ct. 577, 584 n.2 (2018) ("Because probable cause is an objective standard, an arrest is lawful if the officers had probable cause to arrest for any offense, not just the offense cited at the time of arrest or booking. Because unlawful entry is the only offense that the District and its officers discuss in their briefs to this Court, we likewise limit our analysis to that offense.").

Start with why Navarre arrested Hall. Navarre testified that he was verbally ordered to detain Hall "on sight" for assaulting Navarre at a prior protest. (ECF No. 51-10, PageID.944.) Navarre described the assault as "I went to place him under arrest at the time and he struck and pushed away from me, and then ducked down into the crowd." (*Id.* at PageID.936.) But because Hall was not apprehended, officers did not learn his name. (*Id.* at PageID.935.) Craig Schrameck, who was master sergeant for the special operations, stated that he was aware there was an "individual identified" as having assaulted an officer at a prior protest but that individual was not "taken into custody at that time" because of the chaotic situation. (ECF No. 57-2, PageID.1388.) He believed this individual was later identified as Hall. (*Id.* at PageID.1389.) But other than Navarre's testimony, there is no evidence of Hall's alleged assault of him. And Hall says that at the Littleton protest, he was "pushed

21

with a shield" and "pushed to the ground" by police. (ECF No. 61, PageID.1640.) He also said that he did not try to escape officers during that protest. (*Id.* at PageID.1641.) So it appears that a reasonable jury could find that Hall was not the individual who assaulted Navarre at a prior protest or that Navarre had an insufficient basis to believe that Hall was his assailant as he was not identified at the time. So even if this knowledge were imputed to Barr, it would not suffice to give him probable cause to issue a citation for disorderly conduct. (*See* Detroit Municipal Code 31-5-1 (making it "unlawful for any person to make or assist in making any noise disturbance, or improper diversion, or any rout or riot, by which the peace and good order of the neighborhood is disturbed").)

As far as any other basis for disorderly conduct, neither Barr nor Navarre saw Hall act in a disorderly manner at the protest before he was arrested. (ECF No. 51-15, PageID.1018; ECF No. 51-10, PageID.945.) Navarre did testify that the group was "being disorderly, loud, disturbing the peace, people live in that area with the extremely loud music as well as the speakers." (ECF No. 51-10, PageID.946.) But the record does not reveal a factual basis to believe that Hall specifically—as opposed to the group as a whole—was acting in a disorderly manner or contributing to any disorderly activity of the group. Indeed, Barr does not recall seeing any protestor destroy property or be assaultive or aggressive toward police officers. (ECF No. 51-15, PageID.1026.) He did hear excessive noise (*id.*), but Hall said he was not yelling or chanting prior to the incident (ECF No. 61, PageID.1660). So at the very least,

there is a fact issue on whether—even considering the collective factual knowledge of all officers in the record—there was probable cause to cite Hall for disorderly conduct.

The same is true for the other two cited violations. There is a fact issue as to what police order Hall allegedly disobeyed. Barr says, "several orders were given out over the loudspeakers for everyone to disseminate and leave the area. They were advised that it was an unlawful assembly . . . and that if they did not leave, they would be placed under arrest." (ECF No. 51-15, PageID.1018.) However, Hall testified that the police stated, "[t]his is an unlawful assembly and you are ordered to leave the roadways and enter the sidewalks." (ECF No. 61, PageID.1659.) And it is undisputed that Hall was on the sidewalk when he was detained, though Barr testified that he was not aware of that fact until this litigation. (ECF No. 61, PageID.1608; ECF No. 51-15, PageID.1024, 1025; ECF No. 51-10, PageID.947; Video Ex. 2.) But if the Court were to impute Navarre's knowledge to Barr, a reasonable jury could find that protestors were ordered to leave the street and that Hall had complied and moved to the sidewalk. Thus, there is also a fact issue as to whether the officers collectively had probable cause to cite Hall for failure to obey a lawful order of police.

And no reasonable jury would find there was probable cause for citing Hall for blockading a moving lane of traffic because, as established, Hall was on the sidewalk at the time police interrupted the protest and seized him.

In sum, the Court concludes that there is a fact issue as to whether there was probable cause to cite Hall for disobeying a lawful order of police and for disorderly

conduct. But there is no evidence to support a finding of probable cause for the moving-lane violation.

Despite these fact issues, Barr is still entitled to qualified immunity under current Sixth Circuit case law. That is because of a variation of the collective-knowledge doctrine called the good-faith exception. "[I]n a case such as this where one officer's claim to qualified immunity from the consequences of a constitutional violation rests on his asserted good faith reliance on the report of other officers, we consider: (1) what information was clear or should have been clear to the individual officer at the time of the incident; and (2) what information that officer was reasonably entitled to rely on in deciding how to act, based on an objective reading of the information." *Brown v. Lewis*, 779 F.3d 401, 413 (6th Cir. 2015) (citing *Humphrey v. Mabry*, 482 F.3d 840, 848 (6th Cir. 2007)). This good-faith reliance applies in situations even where the collective knowledge "did not amount" to the level of suspicion required. *See Bey*, 946 F.3d at 317.

Indeed, the relevant facts of *Bey v. Falk* are similar to the circumstances Barr faced here. The Sixth Circuit found that "Falk's intended and actual role in this operation was merely to be an arm of the SOU officers—to stop Bey when McKinley gave him the green light." *Bey*, 946 F.3d at 317. Similarly, Barr's role in the police response to the protest was to be the ticketing "arm" of the mobile field officers who conducted the arrests. Barr testified that he started issuing tickets after speaking with Lieutenant Cole, who was in charge of the mobile field force: "Lieutenant Cole and I were talking about the, just shear amount of prisoners that they had. I asked

24

him if he needed any assistance, and he said, he advised me that he could use our help in issuing tickets." (ECF No. 51-15, PageID.1016.) The Sixth Circuit also noted that Falk knew the following before he stopped Bey: "the SOU officers were 'watching some guys' who were 'in the electronics department'"; "that the SOU officer had requested uniformed officers;" that SOU officers had been following Bey and his friends "around from different stores;" and that "SOU officers 'were experienced officers that do a lot of surveillance in high crime areas[.]'" *Bey*, 946 F.3d at 317–18. Importantly, Falk was not aware that Bey had committed any illegal acts while the officers surveilled him. Here too, Barr knew that Hall had been taken into custody by a member of the DPD and that he had been zip-tied; that police had ordered protestors to disperse because they were blocking a major street; and that they were given multiple chances to leave before officers started arresting them. (ECF No. 51-15, PageID.1018.) But like Falk, Barr did not witness Hall individually violate any ordinance. (*Id.*) Moreover, just as Falk believed "the situation was fast-moving," *Bey*, 946 F.3d at 317, Barr testified "there were so many, I mean there was just unusually for this event to happen with that many arrests." (ECF No. 51-15, PageID.1026; *see also* ECF No. 57-2, PageID.1384 (Schrameck testifying, "[i]t was a very chaotic, fluid, violent event, all of them were").)

The Sixth Circuit concluded that "[g]iven Falk's limited involvement, there was nothing that would have alerted him to a likelihood, or even a strong suspicion that McKinley's direction was unlawful. . . . in such a situation, Falk was entitled to act on McKinley's direction without first cross examining him." *Bey*, 946 F.3d at 319. The

Court makes the same conclusion here. Even though the collective knowledge of the officers did not necessarily amount to probable cause to cite Hall, Barr is entitled to qualified immunity on this claim. *See Humphrey v. Mabry*, 482 F.3d 840, 847 (6th Cir. 2007) ("More specifically, where individual police officers, acting in good faith and in reliance on the reports of other officers, have a sufficient factual basis for believing that they are in compliance with the law, qualified immunity is warranted, notwithstanding the fact that an action may be illegal when viewed under the totality of the circumstances."). A reasonable officer in Barr's shoes was entitled to rely on Cole's direction to issue tickets, especially having been given no reason to doubt this order. *See Fleming v. Scruggs*, 465 F. Supp. 3d 720, 739 (E.D. Mich. 2020) ("Scruggs and Garcia (1) were informed that law enforcement (the MDOC) had received a report concerning a suspect and (2) were not given any information that directly called into question the reliability of the report. Thus . . . Scruggs and Garcia were 'permitted to rely on [the] information provided by' the MDOC – 'at least for purposes of determining [their] civil liability.'").

Thus, the Court grants Barr qualified immunity on Hall's federal malicious prosecution claim.

### C. State Law Malicious Prosecution

Hall's state-law malicious-prosecution claim also fails, as he cannot show that Cowan or Barr acted maliciously. "Under Michigan law, [Hall] must show an absence of probable cause, and he must show malice." *Newman v. Twp. of Hamburg*, 773 F.3d 769, 773 (6th Cir. 2014) (citing *Matthews v. Blue Cross & Blue Shield of Mich.*, 572

N.W.2d 603, 609–10 (1998)). That requires evidence that the officer "knowingly sw[ore] to false facts . . . without which there is no probable cause," *Id.* (quoting *Payton v. City of Detroit*, 536 N.W.2d 233, 242 (Mich. Ct. 1995)). Failure to include all exculpatory facts is not adequate to sustain a suit for malicious prosecution. *Id.*

Hall cannot show that Cowan or Barr knowingly made any false representations. As explained, the only representation Cowan made was on the input sheet, which is unlikely to have influenced the prosecution. Even if it did, Cowan said he was ordered to list those charges on the sheet with no knowledge why those were the specified charges. (ECF No. 51-13, PageID.988.) So no reasonable jury could find that Cowan knowingly committed a violation. Likewise, though Barr issued a citation that may not have been supported by probable cause, he did not know that. (ECF No. 51-15, PageID.1024.) So he did not knowingly issue a false citation.

Thus, the state-law malicious-prosecution claim is dismissed as to Barr and Cowan.

\*     \*     \*

To sum up, Cowan did not influence or participate in the decision to prosecute, so he is not liable for malicious prosecution as a matter of law. As for Barr, there is a fact issue as to whether he (or the officers collectively) had probable cause to issue Hall a citation for disorderly conduct, disobeying a lawful order of police, and obstructing a moving lane of traffic. But Barr is still entitled to qualified immunity because a reasonable officer in his shoes would be entitled to rely on another officer's

27

directive to issue the citation. And neither Cowen nor Barr are liable under Michigan law because they did not knowingly swear to false facts.

### D. First Amendment Retaliation

The Court next turns to the First Amendment retaliation claim. To show retaliatory prosecution, Hall must provide evidence that he engaged in protective conduct, that an adverse action was taken against him, and that the adverse action was motivated by his protective conduct. *See MacIntosh v. Clous*, 69 F. 4th 309, 315 (6th Cir. 2023). Defendants argue that no reasonable jury could find for Hall on the second and third elements, both of which are "ordinarily factual questions for a jury." *See Fakhoury v. O'Reilly*, 837 F. App'x 333, 340 (6th Cir. 2020).

But Defendants misconstrue the second element. They argue that Hall's arrest was not an adverse action because Hall has not been deterred from attending protests and that "to state that Plaintiff is a person of 'ordinary firmness' is, *at a minimum*, a compliment to Plaintiff's resilience" because of various medical and other issues Hall has experienced. (ECF No. 51-1, PageID.678.) This reasoning is flawed. An adverse action in this context means an action that would deter a reasonable person from continuing to engage in protected activity. *MacIntosh*, 69 F.4th at 315. "Even at the summary judgment stage, '[the adverse action] threshold is intended to weed out only inconsequential actions, and is not a means whereby solely egregiously retaliatory acts are allowed to proceed.'" *Id.* at 316 (quoting in part *Thaddeus-X v. Blatter*, 175 F.3d 378, 398 (6th Cir. 1999)).

28

The Court breaks no new ground in finding that a reasonable jury could conclude that Barr citing Hall, which led to his subsequent detention and required appearance in court, is an adverse action under the First Amendment. *See Ctr. for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 822 (6th Cir. 2007) ("A two and one-half hour detention absent probable cause, accompanied by a search of both their vehicles and personal belongings, conducted in view of an ever-growing crowd of on-lookers, would undoubtedly deter an average law-abiding citizen from similarly expressing controversial views on the streets of the greater Dayton area."); *Wood v. Eubanks*, 25 F.4th 414, 429 (6th Cir. 2022) (finding adverse action where "police officers removed Wood from a public event under armed escort"); *Hartman v. Moore*, 547 U.S. 250, 256 (2006) ("[T]he law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions, including criminal prosecutions, for speaking out[.]"); *Howell v. Cox*, 758 F. App'x 480, 485 (6th Cir. 2018) (finding arresting plaintiff and issuing him a citation to be individually actionable under retaliatory arrest and retaliatory prosecution theories, respectively). Defendants' arguments otherwise—which focus on whether Hall continues to engage in protests and Hall's other personal attributes—fail to persuade. *See Kubala v. Smith*, 984 F.3d 1132, 1139–40 (6th Cir. 2021) ("The adverse action need not actually chill or silence the plaintiff's First Amendment activities. Nor must the plaintiff possess an Olympian fortitude.").

Having said that, Cowan's participation in these events was minimal—at best, he rode with Hall to the hospital and then transported Hall from the hospital to the

detention center. It is not clear to the Court that such actions meet the *de minimis* standard for adverse actions. *Thaddeus-X*, 175 F.3d at 398 ("We emphasize that while certain threats or deprivations are so de minimis that they do not rise to the level of being constitutional violations, this threshold is intended to weed out only inconsequential actions[.]"). Nevertheless, because the adverse-action burden is minimal at this stage and is typically a question of fact left to a jury, the Court will assume without deciding that Cowan's actions toward Hall satisfy this element.

Accordingly, the retaliation claim boils down to causation. "If an official takes adverse action against someone based on that forbidden motive, and 'non-retaliatory grounds are in fact insufficient to provoke the adverse consequences,' the injured person may generally seek relief by bringing a First Amendment claim." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)). Though described in a straightforward manner, this inquiry is often factually complex with retaliatory and non-retaliatory motives weaving together. It becomes the plaintiff's job to "disentangle these 'wholly legitimate' considerations of speech [when deciding to act] from any wholly illegitimate retaliatory motives." *Novak v. City of Parma*, 932 F.3d 421, 429 (6th Cir. 2019).

To untangle these overlapping considerations, a plaintiff must usually show lack of probable cause for the adverse action to move forward with a First Amendment retaliation claim like the one Hall brings here. *Nieves*, 139 S. Ct. at 1725. The Court has already found that, considering what was known to the officers involved, there is

a fact issue as to whether there was probable cause to issue Hall a citation. So the "no-probable-cause rule" is satisfied at summary judgment. *See id.*

And for the following reasons, the Court declines to apply the good-faith limitation—which provided Barr with qualified immunity in the Fourth Amendment context—to the retaliation claim against Barr.

For one, there is no clear authority for doing so. Defendants have not identified a case that applies this variation of qualified immunity to First Amendment retaliation claims. Indeed, though Defendants mention the good-faith rule in passing when discussing the retaliation claim, they cite no authority for applying this doctrine to a First Amendment claim. (ECF No. 51-1, PageID.678 ("[W]hatever adverse action(s) taken against Plaintiff by Officer Cowan and Sgt. Barr, were inconsequential and, again as previously stated, premised upon each of their good-faith reliance on information provided to them by other officers[.]").) Given the breadth of protection afforded to officers by the good-faith exception to the collective-knowledge doctrine, the Court will not expand its application to a retaliation claim without further support or analysis from the parties.

And other considerations counsel in favor of restraint. Probable cause plays a different role in the context of the First Amendment than it does in the Fourth Amendment. While probable cause is textually mandated by the Fourth Amendment, lack of probable cause to charge or arrest has become a requirement for First Amendment retaliation claims for practical reasons. As the Court mentioned, the causation inquiry in this context has proven to be a difficult undertaking. Indeed, , in

*Hartman* and *Nieves*, the Supreme Court reasoned that a lack of probable cause "provides a 'distinct body of highly valuable circumstantial evidence' that is 'apt to prove or disprove' whether retaliatory animus actually caused the injury: 'Demonstrating that there was no probable cause for the underlying criminal charge will tend to reinforce the retaliation evidence and show that retaliation was the but-for basis for instigating the prosecution, while establishing the existence of probable cause will suggest that prosecution would have occurred even without a retaliatory motive.'" *Nieves*, 139 S. Ct. at 1723 (quoting *Hartman*, 547 U.S. at 261). Thus, lack of probable cause in the First Amendment context serves as a proxy for causation and is helpful to determine whether retaliatory animus was the but-for cause. It is not intended to be the sine qua non of causation, but rather a threshold inquiry that, if met, tends to give more probative force to other evidence of animus.

For example, the Supreme Court recognized an exception to the no-probable-cause rule. *Nieves*, 139 S. Ct. at 1727 ("[W]e conclude that the no-probable-cause requirement should not apply when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been. That showing addresses *Hartman*'s causal concern by helping to establish that 'non-retaliatory grounds [we]re in fact insufficient to provoke the adverse consequences.'" (quoting in part 547 U.S. at 256)). And the Sixth Circuit has also discussed a scenario where probable cause may not doom a plaintiff's retaliation claim. *See Novak v. City of Parma*, 932 F.3d 421, 431 (6th Cir. 2019) ("[I]n *Nieves* and its predecessors, the Court based its reasoning on

32

the thorny causation issue that comes up in cases with both protected speech and unprotected conduct. The idea is that in cases where the plaintiff both did something and said something to get arrested, the factfinder will not be able to disentangle whether the officer arrested him because of what he did or because of what he said. . . . Here, that inquiry gets us nowhere because 'absent [Novak's] protected speech,' there would be no basis for probable cause. So, in this case, the causal connection is not so tenuous. And the reason for requiring that plaintiff show an absence of probable cause where probable cause is based only on protected speech is not so clear.").

Likewise, a district court reasoned that—though the collective-knowledge doctrine created a fact issue on probable cause allowing the Fourth Amendment claim to survive—possible lack of probable cause did not create a fact issue on retaliation because there was no other evidence of retaliatory animus. *See Johnson v. Cnty. of San Bernardino*, No. 18-2523, 2020 WL 5224350, at *19–20 (C.D. Cal. June 24, 2020) ("[J]ust because Ramos's knowledge (or defects therein) are shared with Baltierra for purposes of establishing reasonable suspicion/probable cause via the collective-knowledge doctrine, the Court does not believe that evidence bearing upon the question of Ramos's First Amendment-related animus tied to a possible probable cause defect is also transmitted to Baltierra."). In other words, retaliatory animus should not be determined based on officers' collective psyche.

This reasoning emphasizes the limited role probable cause plays in the retaliation context and cautions against rote application of a Fourth Amendment

analysis to a First Amendment claim. Given this distinct role, the Court hesitates to apply the good-faith limitation of the collective-knowledge doctrine and grant Barr qualified immunity on the First Amendment claim.

Thus, as the Court has already ruled that there is a fact issue as to whether Barr had probable cause to issue the citation to Hall, it moves on to the next part of the causation analysis: "if the plaintiff establishes the absence of probable cause, then . . . [t]he plaintiff must show that the retaliation was a substantial or motivating factor behind the [citation], and, if that showing is made, the defendant can prevail only by showing that the [citation] would have been initiated without respect to retaliation." *Nieves*, 139 S. Ct. at 1725.

Though close, the Court finds that, on this current record, there is a fact dispute on both of these issues. Hall has shown some evidence that his participation in the protest was a motivating factor behind Barr issuing him the citation. Barr's reasoning for why he believed Hall had committed a crime was Hall's presence at the protest: "Q. Did you ever witness Timothy Hall disobey a lawful order of a police officer? A. Timothy Hall specifically, no. But as a group, yes. . . . [H]e was in a group that did. . . . He had zip ties on, which would lead me to believe he was at the scene[.]" (ECF No. 51-15, PageID.1018.) However, it has long been established that mere presence at a scene where criminal activity has taken place or association with a group is not sufficient to establish probable cause. *See generally Ybarra v. Illinois*, 444 U.S. 85, 91 (1979) ("But, a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to

search that person."). And though Hall's participation in the protest may be "part of the practical considerations of everyday life" that can be considered in the probable-cause calculus, *see U.S. v. Padro*, 52 F.3d 120, 123 (6th Cir. 1995), Barr never actually saw Hall protest. He saw Hall after he was arrested and zip-tied while he was sitting on the curb and assumed from Hall's arrest that Hall was a protestor. But Barr recognized that the protest itself was not unlawful—it became unlawful because more than a hundred individuals were "blocking Woodward, a main avenue in the city with traffic, you can't do that. . . . I mean if they were up on the sidewalk, that would be something different." (ECF No. 51-15, PageID.1019.) Not only does this support Hall's version of events—that the only lawful order from police was to move out of the street—but it also shows that Barr differentiated between standing on the sidewalk versus the street. However, that distinction apparently did not matter when it came to issuing Hall a citation, as Barr did not learn Hall's location until after this lawsuit commenced and did not attempt to do so. Thus, taking these facts in the light most favorable to Hall, a reasonable jury could conclude that Barr issued the ticket merely because he believed Hall was protesting, and not because he thought Hall was individually violating the ordinances he was cited for.

True, when asked whether he issued the citation based on the group as a whole rather "than what each individual did or did not do at the assembly," Barr altered his prior testimony: "Well, no. They were all advised to leave the area. So at that point, when it was unlawful, it didn't matter if they were up on the sidewalk. If they were in that general vicinity, they were advised to leave." (ECF No. 51-15, PageID.1018.)

But this reasoning puts the cart before the horse—as Barr seemingly recognized moments earlier. There had to be a separate reason why the protest was unlawful such that the police's order to disperse was a lawful order. The protest was not unlawful merely because officers said so, thereby giving officers carte blanche to arrest every protestor. And it seems from the evidence before this Court that this particular protest was deemed unlawful because it blocked Woodward Avenue, which would also be the reason why protestors were arrested. The issue for Barr is that his reasoning for issuing Hall a citation was much broader than the one discussed here and seemed to rely more on Barr's assumption that Hall was a protestor rather than an assumption that Hall engaged in the specific criminal activity at issue. (*See, e.g.*, ECF No. 51-15, PageID.1018 ("Q. And again . . . you're referring to the group, not necessarily each individual? A. Right. The group as a whole.").)

But the facts could tell more than one story. A reasonable jury could also infer that Barr's reliance on Hall's arrest in issuing the citation indicates that Barr believed another officer had probable cause. (ECF No. 51-15, PageID.1018 ("Q. And in terms of yourself, how would you know that Timothy Hall was in a group that was . . . disorderly . . . ? A. Well, because he was taken into custody by a member of the Detroit Police Department.").) In other words, perhaps Hall's association with the protest did not matter so long as Barr believed another officer saw Hall commit a crime and arrested him. In support of that narrative, Defendants point to evidence showing that Barr issued the citation because he was ordered to do so, which would cut against animus being the but-for cause. (*Id.* at PageID.1016 ("Q. In terms of

36

issuing the tickets for those prisoners, how did you make a determination to issue tickets? A. I spoke with . . . Lieutenant Cole and I were talking about the, just shear amount of prisoners that they had. I asked him if he needed any assistance, and he said, he advised me that he could use our help in issuing tickets.").)

The jury must ultimately weigh this competing evidence and decide whether retaliatory animus is the but-for cause. Indeed, in *Novak*, the Sixth Circuit contemplated a similar situation where a plaintiff would have evidence of retaliatory animus and the officer would have evidence that he mistakenly believed he had probable cause to take the disputed action. 932 F.3d at 429 ("So the questions will be: (1) Can Novak show that the officers were motivated by retaliatory animus, not legitimate motivations? (Novak's burden); if yes, (2) Can the officers justify Novak's arrest based on something other than retaliation—i.e., a mistaken but honest belief that there was probable cause? (Officers' burden)."). At this stage, the Court cannot say that every reasonable jury would believe Defendants' theory—that Barr honestly believed he had probable cause either from the arresting officer or because he was ordered to issue the citations—over Hall's theory—that Barr was primarily motivated to issue the citation because of Hall's apparent association with the protest. So the retaliation claim against Barr will go to a jury.

On the other hand, there is little evidence that Cowan acted based on retaliatory animus. For starters, as discussed above, Cowan had minimal involvement in this incident. Because of this, it is difficult to home in on his precise motivations for this task. But based on his general testimony, no reasonable jury

could find that retaliatory animus was the but-for cause of Cowan's actions. Cowan testified that he went to Detroit Receiving Hospital because "a few protestors, I didn't know who exactly, were being, I guess being charged at the time and I was told to go sit on them until they got cleared and transported to Detroit Detention." (ECF No. 51-13, PageID.985; *id.* at PageID.986 ("And we were told to wait until they are . . . sent from the hospital, cleared from the hospital to go to the Detroit Detention Center.").) Likewise for filling out the input sheet at the detention center. (*Id.* at PageID.988 ("So while I am filling out the intake sheet, that's when I was advised to put on the intake sheet the disorderly conduct and obstructing justice. So in regards to . . . why he got charged in the two situations, I don't know. But I was ordered to put disorderly conduct and obstructing.").) This hardly suggests retaliatory animus or even knowledge of Hall's participation in the protest. And Cowan stated he arrived after the protest had dispersed, so he did not witness any protest activity, which further attenuates the causal connection. (*Id.*); *see also Nieves*, 138 S. Ct. at 1728. Given the lack of evidence showing Cowan's actions were based on retaliatory animus, the Court will dismiss this claim as to him.

## E. *Monell*

Hall's *Monell* claim appears to be premised on former police Chief James Craig—an official with final decision-making authority—ordering or ratifying the specific actions the officers undertook as to Hall. (ECF No. 57, PageID.1359–1360 ("Plaintiff has shown that Defendants' actions arose from official orders, all the way up to the Chief of Police who was acting as the highest ranking DPD member.").) The

issue is that the record shows no connection between Chief Craig's actions or statements and the officers' conduct as to Hall. The only evidence Hall points to in his brief that implicates Chief Craig is one line from Commander Darin Szilagy. Szilagy was describing an issue involving officers not having body-worn cameras at the protest. In describing what actions he took concerning that issue, he stated "[I] recall a conversation with [another officer] we were forming up, forming a line, we were going to move, and got the Chief on the phone and we had to engage I find out." (Audio Ex. 6, 8:28–8:44.) At best, this one line shows that Craig directed the officers to engage with protestors—not that he ordered any officer to target, take down, arrest, or retaliate against Hall specifically. And the record does not show that every arrest at the protest was unlawful. So evidence of any general orders from Craig about engaging or shutting down the protest does nothing to show that he decided to unlawfully arrest Hall or ordered his officers to do the same.

Hall then changes course and focuses on other officers. True, Navarre testified that Craig Schrameck, who was master sergeant for the special operations, and Cole, who was in charge of the Mobile Field Force, among others, gave orders that Hall "was an individual wanted . . . for arrest." (ECF No. 51-10, PageID.947.) But Hall presents no evidence or argument that Schrameck and Cole possess "final decision-making authority" as *Monell* requires. *See Wallace v. Coffee Cnty., Tenn.*, 852 F. App'x 871, 877 (6th Cir. 2021) ("As a preliminary matter, it is not clear to us that Rick Gentry is actually an official with final decision-making authority."); *Nichols v. Wayne Cnty., Mich.*, 822 F. App'x 445, 449 (6th Cir. 2020) ("To hold the municipalities

liable under *Monell*, he must . . . ultimately prove, that the municipalities themselves, as opposed to any municipal employee, were responsible for the prolonged detention of his vehicle without process.”). Without evidence establishing the specific duties Schrameck, Cole, and other “command staff” were responsible for, no reasonable jury could find that they possess final decision-making authority for the Detroit Police Department.

Hall also argues that evidence shows that he was targeted for being associated with Detroit Will Breathe. But the Court is not so sure. Navarre testified that though the “violent crime task force . . . would brief us . . . through our supervisors of who to look out for,” Hall “was never on a formal list because they did not know his real name at the time.” (ECF No. 51-10, PageID.935.) When asked what was “disseminated involving” Hall, Navarre responded, “Nothing in particular. So I did my own survey license on the organization, and based on my own previous experiences as well as talking to the Mobile Field Force command, their sergeants and lieutenants, we needed to get him detained, arrested, and identified in order to actually properly label him, or get a name to him anyway.” (*Id.*) Schrameck stated that command staff identified targets “or anybody that was pointed out that we needed to arrest based on their actions during the protest or from prior protests.” (ECF No. 57-2, PageID.1382.) He explained that there was no list, but they were given “verbal instructions . . . based on prior knowledge[.]” (*Id.*) He also stated that Hall “was identified that night as being . . . what he was dressed in to be one of the agitators. And that was verbally given out, myself, the field force, by the command staff . . . I

40

believe he was known to the officers as being the subject that was at the Littleton protest." (*Id.* at PageID.1396.) Again, none of this is connected to Craig. The Court has little idea who the "command staff" was and whether their roles within the Department would constitute "final decision-making" authority on its behalf. Simply put, there is no evidence to suggest that these orders constituted official Department policy.

Accordingly, the *Monell* claim is dismissed.

## IV. Conclusion

In all, the motion for summary judgment from Cowan, Barr, and the City of Detroit is GRANTED IN PART. The First Amendment retaliation claim survives as to Barr. With no remaining claims against them, Cowan and the City of Detroit are dismissed from this lawsuit.

As Navarre did not file a motion for summary judgment, all claims against him will also proceed.

Hall's motion for reconsideration is DENIED. (ECF No. 58.)

SO ORDERED.

Dated: July 10, 2023

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE

41